**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
ROGER STEIN,

                                    **Petitioner,**

              - v -                                             **9:04-CV-0439**
                                                                **(NAM/GHL)**

**SUPERINTENDENT ARTUS,**

                                    **Respondent.**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**APPEARANCES:**                    **OF COUNSEL:**

**ROGER STEIN**
Petitioner, *Pro Se*
00-B-2604
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

**HON. ANDREW M. CUOMO**          **ALYSON J. GILL, ESQ.**
Attorney General for the          Assistant Attorney General
State of New York
Attorney for Respondent
120 Broadway
New York, NY 10271

**GEORGE H. LOWE**
**United States Magistrate Judge**

                **MEMORANDUM-DECISION AND ORDER**[1]

**I.       BACKGROUND**

        **A.       State Court Proceedings**

        The state court records reflect that on Saturday, August 26, 2000, Paul Bravos, the

owner of the Syracuse Restaurant Exchange ("S.R.E.") in Syracuse, New York, had hired Hugh

_____

        [1]      This matter is ripe for disposition before this Court pursuant to the consent of
the parties and the order of Chief United States District Judge Norman A. Mordue.  *See* Dkt.
No. 26; *see also* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73.

Calkins and James Lubeck to remove scrap metal shelving from the premises of S.R.E.  *See* Transcript of Trial of Roger Stein (3/11/2002) ("Trial Tr.") at pp. 602-03.

When Calkins and Lubeck arrived at the S.R.E. on August 26th at approximately 5:45 p.m, they met petitioner, *pro se* Roger Stein, who was also helping Bravos move the metal shelving.  Trial Tr. at pp. 603, 618-21.  Lubeck and Calkins loaded some scrap metal into their truck, spoke with Bravos for between fifteen and twenty minutes, and then left the establishment.  Trial Tr. at pp. 605, 611-12, 626-27.  At the time those two left, Stein and Bravos were observed drinking beer together.  Trial Tr. at pp. 611-12.

At approximately 10:00 p.m. on August 26, 2000, Lubeck was driving by the S.R.E. when he noticed that the gate to the S.R.E. was open and Bravos' truck was still parked outside that building. Trial Tr. at p. 629.  That concerned Lubeck, and, after he contacted Calkins, the two men entered S.R.E. and eventually discovered Bravos lying in a pool of blood with a chair near his head.  Trial Tr. at pp. 607-08, 629-31.  The men immediately summoned help and Dr. David Vitberg and James Snell soon thereafter arrived in an ambulance.  Trial Tr. at pp. 555-60, 609-10.  An examination of Bravos at the scene revealed that he was bleeding from his head and that he had also sustained significant injuries to his mouth.  Trial Tr. at pp. 574-75, 660-63.  As Dr. Vitberg tried to stabilize Bravos, he began exhibiting signs suggestive of a brain injury, including combativeness, incoherent speech, and an inability to localize his injuries.  Trial Tr. at pp. 570-71.  Bravos was then transported to University Hospital.  Dr. David Carter, a neurosurgeon at University Hospital, treated Bravos after he arrived, semi-conscious, in the hospital's emergency room on August 27, 2000.  Trial Tr. at pp. 847-49.  A computed tomography ("CT") scan performed on Bravos indicated hemorrhaging within Bravos' skull and

2

scattered contusions to his brain.  Trial Tr. at p. 852.  Additionally, blood was discovered on both sides of his brain, as was congealed blood in the brain together with bruising to that organ which indicated that his brain had been shaken within the skull.  Trial Tr. at pp. 852-53.  Dr. Carter ultimately concluded that Bravos had sustained a "severe brain injury" at the S.R.E. Trial Tr. at p. 856.  Approximately two weeks after Bravos entered University Hospital, a blood clot that he had developed eventually caused him to suffer a stroke.  Trial Tr. at pp. 857-58. Although surgery was successfully performed that relieved pressure building in his brain that prevented further injury to that organ, Bravos eventually died from his injuries on February 7, 2001.  Trial Tr. at pp. 858-59.

Dr. Mary Jumbelic, the Chief Medical Examiner for Onondaga County, performed an autopsy on Bravos the day after he died.  Trial Tr. at pp. 1116-17.  That autopsy revealed that Bravos' brain was bruised at its top as well as on both of its sides.  Trial Tr. at p. 1120.  Dr. Jumbelic testified that Bravos' brain injuries were consistent with his being struck in the top of the head, i.e., blunt force trauma, rather than injuries attributable to a fall.  Trial Tr. at p. 1122. She further declared that nothing in Bravos' medical treatment, nor in his anatomy, suggested that he had contributed to his own death or that his death was due to natural disease.  Trial Tr. at pp. 1123-24.  The medical examiner therefore concluded that Bravos' death was a homicide caused by blunt force head trauma.  Trial Tr. at p. 1123.

The record also reflects that Detective-Sergeant Thomas Connellan of the Syracuse Police Department was dispatched to the S.R.E. after Bravos was discovered.  Trial Tr. at p. 521.  When Detective Connellan arrived at the scene, he found a large pool of blood on the floor as well as a chair tipped on its side that contained particles of blood.  Trial Tr. at pp. 521-

3

24.  Detectives Eric Carr and Richard W. Morris of the Syracuse Police Department were also assigned to investigate the incident involving Bravos, and, after questioning both Lubeck and Calkins, the detectives began looking for Stein to question him about what they suspected may have been an assault perpetrated on Bravos.  Trial Tr. at pp. 681-86, 752.  When Stein was located, he agreed to accompany the officers to the police station, after which he was brought to an interview room and advised of his *Miranda* rights.[2]  Trial Tr. at pp. 752-54.  Stein informed the detectives at that time that from Monday through Thursday of the prior week, he had worked for a local construction company, and that between Friday through Sunday, he had not left the apartment of an acquaintance who was living in Solvay, New York.  Trial Tr. at pp. 692-93, 755-56.  After further questioning, Stein eventually conceded that he had helped a man move some shelving at the S.R.E., however Stein insisted that he had helped that individual on a Wednesday, not a Saturday, and he reiterated his claim that he had spent Saturday, August 26, 2000 in Solvay and not the city of Syracuse.  Trial Tr. at p. 694.

After law enforcement agents ended their questioning of Stein, they drove to Solvay to speak with Heather Andrews, the individual with whom Stein claimed he was on the day Bravos was assaulted.  Trial Tr. at pp. 760-61.  Andrews advised the detectives that Stein had stayed with her on Friday night but she claimed that he had left her apartment on Saturday afternoon and did not return to her home until late Saturday night.  Trial Tr. at p. 761.[3]  The significant difference between her statement and that of Stein caused the police to again

---

[2]        *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]        Andrews also informed the detectives that when Stein left her apartment on Saturday afternoon, he was wearing blue jeans, a white t-shirt and dark colored boots.  Trial Tr. at p. 700.

question Stein, and when he was confronted with the information that Andrews had provided to the police, he became "boisterous, raised his voice [and] refused to answer that particular question."  Trial Tr. at p. 761.  Around that time, Detective Carr noticed what he believed to be blood spatter on Stein's boots and thereafter obtained his permission to examine them.  Trial Tr. at pp. 701-03.  A field test performed on the substance found on the boots revealed the presence of blood.  Trial Tr. at pp. 702-03, 896-97.[4]

Stein eventually admitted to Syracuse Police Detective Ivan Jimenez that on Saturday, August 26th, Stein was riding his bicycle near the S.R.E. when he noticed Bravos moving metal shelves.  Trial Tr. at p. 813.  Stein decided to stop and help Bravos so he got off of his bicycle.  Trial Tr. at p. 813.  Stein stated that soon thereafter, two men came by and loaded scrap metal of that business into a truck, stayed for a few minutes to talk with Bravos and then left.  Trial Tr. at p. 813.  Stein claimed that he had stayed with Bravos a few minutes longer and that he then left the building.  Trial Tr. at p. 813.  When Detective Jimenez asked Stein how Bravos may have sustained his injuries, Stein smiled, however he never incriminated himself.  Trial Tr. at pp. 814-15.  Stein specifically denied robbing or hitting Bravos, and boasted that if he had assaulted Bravos, he would have been killed.  Trial Tr. at pp. 816-19.

Following his arrest, Stein was incarcerated at the Onondaga County Justice Center with Damion Coleman, a man who knew Stein prior to that date.  Trial Tr. at p. 784.  While the two were incarcerated together, Stein admitted to Coleman that he had become embroiled in a

---

[4]     Subsequent deoxyribonucleic acid ("DNA") testing that was performed on the blood found on Stein's boots established that the probability that the blood came from someone other than Bravos was 1 in 383,000,000.  Trial Tr. at p. 956.

dispute with an "old man" on whom Stein "blacked-out." Trial Tr. at pp. 785-86.[5]  Stein also

admitted to Coleman that after the "black-out" involving the elderly man, Stein instigated a

fight with another man, Allen Guyton, and smeared blood onto Stein's shirt to create an alibi if

he were questioned about blood stains found on his clothing.  Trial Tr. at pp. 786-787.

Coleman's testimony was buttressed by the testimony of Guyton, who declared that in August

of 2000, he and his girlfriend were in Syracuse, New York when Stein approached the two and

initiated an argument.  Trial Tr. at pp. 802-803.  Guyton admitted that he and Stein were

involved in an altercation that resulted in Stein bleeding from a wound he sustained in the fight

with Guyton.  Trial Tr. at p. 803.

Detective Terrence McGinn, a specialist with the Syracuse police department in the area

of forensic blood spatter analysis, testified that for a blood spatter pattern to appear at a scene, a

victim must be assaulted multiple times because blood must first be brought to the skin surface

by the initial blow or blows, and additional blows are necessary to cause the blood to be

projected away from the body.  Trial Tr. at p. 1070.  Detective McGinn testified that he had

examined photographs taken at the crime scene and concluded that a "significant amount of

force" was needed to cause the blood spatter that was present at the scene where the victim was

discovered.  Trial Tr. at pp. 1045, 1054-55.  Additionally, according to Detective McGinn, the

varying heights at which the blood spatter was found indicated that some of the blood had come

from its source – Bravos' head – before he hit the ground.  Trial Tr. at p. 1059.[6]  The lower

---

[5]       According to the trial testimony, the phrase "black-out" in this context means
to violently attack someone.  Trial Tr. at p. 786; *see also* Trial Tr. at p. 804.

[6]       The testimony established that Bravos was about 30 inches from the ground
when the blood started leaving his body, evidence that suggested that he was hunched over

blood spatters found at the scene indicated to Detective McGinn that Bravos' head was also struck at a time when his head was within six inches of the ground.  Trial Tr. at p. 1063.

In his defense to the charges against him, Stein testified that on August 26, 2000, he was riding his bicycle near the S.R.E. when he saw Bravos and stopped to help him and two other men load metal shelving into a truck.  Trial Tr. at pp. 1473-74.  Stein testified that he stayed there for a period of time, but that he left before Calkins and Lubeck left the establishment. Trial Tr. at pp. 1474-75.  Stein also testified that he was wearing sneakers on August 26th, and that he did not find the boots spattered with Bravos' blood until three days later, when he discovered them in a pile of garbage on North State Street in Syracuse.  Trial Tr. at pp. 1475-76.  The defense also called Dr. Louis Prince, a physician in the emergency department of University Hospital, who treated Bravos while at that facility.  Trial Tr. at pp. 1200-01.  Dr. Prince testified that Bravos had suffered a significant head injury with bleeding on his brain, and that the injuries he had sustained could have been caused by a fall.  Trial Tr. at pp. 1227-28.[7]  Keith Fairchild, a private investigator, was also called as a defense witness.  Trial Tr. at p. 1262.  Fairchild testified that he had reviewed the photographs of the crime scene, as well as the analysis of Detective McGinn, and that Fairchild thereafter concluded that the mixture of fresh and coagulated blood at the scene, though consistent with a beating, may have been caused by the victim either spitting or expiating blood.  Trial Tr. at pp. 1286-88.  Although Fairchild did not believe that a beating had occurred, he conceded on cross-examination that he was unaware

_____

and protecting himself.  Trial Tr. at pp. 1078-79.

[7]      Dr. Prince could not, however, testify to a reasonable degree of medical certainty as to what had caused the victim's injury, and declared that he would defer to the medical examiner's conclusion in this regard.  Trial Tr. at p. 1243.

until the time of trial that the victim had sustained two contusions to his head that had caused subdural hematomas.  Trial Tr. at p. 1317.  Fairchild also volunteered that some of the injuries Bravos had sustained were "out of [his area of] expertise."  Trial Tr. at p. 1318.  Dr. John Mullen, the Director of the Emergency Medical Center at the Titus Regional Medical Center in Mount Pleasant, Texas, testified on behalf of the defense that blood in a victim's mouth could significantly impact blood spatter found at a scene, and that the coughing of such blood could change "low-velocity" blood spatter to "high-velocity."  Trial Tr. at pp. 1383-84.  Dr. Mullen testified that it was unusual for lacerations like those found on Bravos' face to be caused by a punch, Trial Tr. at p. 1389, and opined that the subdural hematomas which the victim sustained could have been caused either by a fall or a blow to the head.  Trial Tr. at p. 1399.

Dr. Robert Schelper, the Director of Anatomical Pathology at Upstate Medical Center, testified for the prosecution on rebuttal.  Trial Tr. at p. 1454.  Dr. Schelper examined Bravos' brain at the autopsy and concluded that it displayed evidence of hemorrhaging and contusions at the top, but no bruises to the bottom.  Trial Tr. at pp. 1455-59.  This bruise pattern was consistent with injuries that would be suffered by a person who had been hit on the top of the head, and was atypical of injuries sustained by an individual as a result of a fall, which would ordinarily result in the bottom of the victim's brain sustaining trauma.  Trial Tr. at pp. 1459-60.

Following Dr. Schelper's rebuttal testimony and closing arguments of counsel, the trial court instructed the members of the jury on the governing law they were to consider in conjunction with the indictment returned against Stein.  *See* Trial Tr. at pp. 1604-52.  The jury then began its deliberations, during which it made several requests of Judge Aloi, including requests that the County Court read back certain trial testimony as well as portions of the

8

court's instructions.  Trial Tr. at pp. 1658-91.  The jury ultimately returned a unanimous verdict

in which it found Stein guilty of the depraved indifference murder of Bravos.  Trial Tr. at p.

1692.

On April 17, 2002, Stein appeared before Judge Aloi for sentencing.  At that

proceeding, the County Court sentenced him to a term of twenty-five years to life

imprisonment.  *See* Transcript of Sentencing of Roger Stein (4/17/02) ("Sentencing Tr.") at p.

33.

Stein appealed his conviction to the New York State Supreme Court, Appellate

Division, Fourth Department.  Through counsel's appellate brief, Stein argued the following

grounds in support of his appeal:  1) his right to testify before the grand jury was violated and

consequently the indictment should have been dismissed; 2) the evidence adduced at trial was

insufficient to sustain the jury's guilty verdict; 3) that verdict was against the weight of the

evidence; and 4) the seizure of his boots by law enforcement agents was improper, and the use

of evidence obtained from those boots improperly admitted into evidence against Stein.  See

Appellate Brief on Appeal (12/30/02) ("App. Br.").  The Onondaga County District Attorney

filed a brief in opposition to Stein's appeal, and in a Decision and Order dated June 13, 2003,

the Appellate Division affirmed petitioner's conviction and sentence.  *People v. Stein*, 306

A.D.2d 943 (4th Dept. 2003).  Stein sought leave to appeal that decision to the New York Court

of Appeals, however that court denied Stein's leave application in its order dated August 25,

2003.  *People v. Stein*, 100 N.Y.2d 592 (2003).  His application for reconsideration of that order

was denied by the Court of Appeals on December 30, 2003.  *People v. Stein*, 1 N.Y.3d 581

(2003).

9

### B.   **This Action**

Petitioner commenced this proceeding, *pro se*, on April 19, 2004.  *See* Dkt. No. 1.
Now-Chief United States District Judge Norman A. Mordue then ordered Stein to file an
amended pleading if he wished to maintain this action, *see* Dkt. No. 3, and on May 14, 2004,
Stein filed an amended petition in accordance with the Court's directive.  *See* Dkt. No. 4 ("Am.
Pet.").  In that pleading, Stein argues that:  i) the trial court committed reversible error when it
failed to dismiss the indictment after Stein was deprived of his right to testify before the grand
jury; ii) the verdict was against the weight of the evidence; iii) the evidence presented at trial
was insufficient to sustain the conviction; and iv) the County Court wrongfully denied Stein's
suppression motion.  *See* Am. Pet., Grounds One through Four.

On May 9, 2005, the Office of the Attorney General for the State of New York, acting
on respondent's behalf, filed an answer and memorandum of law in opposition to Stein's
pleading.  Dkt. Nos. 13-14.  In opposing his petition, respondent argues that none of petitioner's
habeas claims have merit.  *See* Dkt. No. 13 ("Resp. Mem.").  Petitioner thereafter submitted a
"traverse" in further support of his request for federal habeas intervention.  Dkt. No. 17
("Traverse").

## II.   **DISCUSSION**

### A.   **Standard of Review**

The April, 1996 enactment of the Antiterrorism and Effective Death Penalty Act
("AEDPA") brought about significant new limitations on the power of a federal court to grant
habeas relief to a state prisoner under 28 U.S.C. § 2254.

In discussing this deferential standard, the Second Circuit noted in *Rodriguez v. Miller*,

10

439 F.3d 68 (2d Cir. 2006) that:

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of
> the facts in light of the evidence presented in the State court
> proceeding."

*Rodriguez*, 439 F.3d at 73 (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo*, 403

F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v.*

*LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).  In providing guidance concerning application of this

test, the Second Circuit has recently noted that:

> [A] state court's decision is "contrary to" clearly established
> federal law if it contradicts Supreme Court precedent on the
> application of a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but
> nevertheless comes to a different conclusion than the Court did.
> [*Williams v. Taylor*, 529 U.S. 362,] at 405-06 [2000]; *Loliscio v.*
> *Goord*, 263 F.3d 178, 184 (2d Cir. 2001).... [A] state court's
> decision is an "unreasonable application of" clearly established
> federal law if the state court "identifies the correct governing
> legal principle from [the Supreme] Court's decisions but
> unreasonably applies that principle to the facts" of the case before
> it.  *Williams*, 529 U.S. at 413.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d

147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

      Significantly, a federal court engaged in habeas review is not charged with determining

whether the state court's determination was merely incorrect or erroneous, but instead whether

such determination was "objectively unreasonable."  *Williams*, 529 U.S. at 409; *see also Sellan*

*v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001).  Objectively unreasonable in this context has

been interpreted as meaning that "'some increment of incorrectness beyond error is required'" for the habeas court to properly grant a habeas application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quoting *Francis S.*, 221 F.3d at 111).

### B.    Substance of Stein's Claims

#### 1.    Failure to Dismiss the Indictment

In support of his claim that the indictment should have been dismissed by the trial court, Stein argues that on March 29, 2001, he advised the District Attorney that Stein intended to testify before the grand jury. *See* Am. Pet., Ground One.  Petitioner asserts that notwithstanding his clear notice to that office, he never received notice of the day on which the District Attorney presented his case to the grand jury, thereby preventing Stein from testifying before that accusatory body.  He argues that although the County Court was aware of the foregoing, it nevertheless refused to dismiss the indictment in a decision that "is wrong for many reasons" and contrary to the provisions of New York's Criminal Procedure Law ("CPL"), § 190.50(5)(a).[8]  *See* Supporting Mem. at (unnumbered) pp. 1-4.

However, federal courts have not recognized a constitutional right to indictment by a grand jury in state criminal prosecutions.  *See Campbell v. Greene*, 440 F.Supp.2d 125, 142 (N.D.N.Y. 2006) (McCurn, S.J.) (citing *Smith v. Walsh*, No. 00-CV-5672, 2003 WL 22670885,

---

[8]　　CPL § 190.50(5) provides, in salient part:

> Although not called as a witness by the people or at the instance of the grand jury, a person has a right to be a witness in a grand jury proceeding ... (a) When a criminal charge against a person is being or is about to be or has been submitted to a grand jury....

CPL § 190.50(5)(a).

at *7 (E.D.N.Y. Oct. 20, 2003); *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972)).  Habeas

claims based upon defects that purportedly occurred in state grand jury proceedings are

therefore not reviewable in a petition for a writ of habeas corpus relief absent the existence of

an independent, federal constitutional claim.  *See Campbell*, 440 F.Supp.2d at 142 (citing *Lopez*

*v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989); *Barnes v. Giambruno*, No. 01 CIV. 8965, 2002 WL

850020, at *7 (S.D.N.Y. May 2, 2002)).  Petitioner has not asserted any such independent claim

in conjunction with the first ground for relief asserted in his amended petition.

 Moreover, even assuming that Stein had the right to indictment by a grand jury, he

would nevertheless not be entitled to habeas relief on this ground in light of the jury's guilty

verdict.  As the Supreme Court explained in *United States v. Mechanik*, 475 U.S. 66 (1986):

> [T]he petit jury's subsequent guilty verdict means not only that
> there was probable cause to believe that the defendant[] w[as]
> guilty as charged, but also that [he is] in fact guilty as charged
> beyond a reasonable doubt.  Measured by the petit jury's verdict,
> then, any error in the grand jury proceeding connected with the
> charging decision was harmless beyond a reasonable doubt.

*Mechanik*, 475 U.S. at 70; *see also Campbell*, 440 F.Supp.2d at 142 (citing *Mechanik*; *United*

*States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998) (other citations omitted)).

 In light of the foregoing, this Court denies Stein's first ground for relief, which seeks

federal habeas intervention due to the claimed denial of his right under the CPL to testify before

the grand jury.  *See Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *26

(S.D.N.Y. Sept. 7, 2007) (citations omitted); *Dixon v. McGinnis*, 492 F.Supp.2d 343, 347 n.2

(S.D.N.Y. 2007); *Moore v. Herbert*, No. 02-CV-0999, 2005 WL 3591815, at *11 (N.D.N.Y.

Dec. 30, 2005) (Mordue, J.), *appeal dismissed*, *Moore v. Herbert*, No. 06-0522-pr (2d Cir. Sept.

11, 2006).

>    **2.    Sufficiency of Jury's Verdict**

The second and third claims for relief in Stein's amended pleading both challenge the propriety of the jury's guilty verdict.  Specifically, his second ground argues that the verdict was against the weight of the evidence, while his third claim contends that the evidence adduced at trial was legally insufficient to sustain the jury's guilty verdict.  *See* Am. Pet., Grounds Two, Three.

As to petitioner's second ground, the Court notes that "weight of the evidence" review of a conviction is a product of New York state statute and therefore merely a state law issue. *See* CPL § 470.15; *Van Stuyvesant*, 2007 WL 2584775, at *21 n.20 (citations omitted); *Ward v. Herbert*, ___ F.Supp.2d ___, ___, 2007 WL 2544010, at *10 (W.D.N.Y. Sept. 6, 2007) (citations omitted); *Graham v. Ricks*, No. 02-CV-0303, 2004 WL 768579, at *14 (N.D.N.Y. Apr. 7, 2004) (McCurn, S.J.) (citations omitted), *appeal dismissed*, No. 04-2650-pr (2d Cir. Dec. 20, 2004). Since federal habeas corpus review is not available to remedy mere errors of state law, *see Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991), no cognizable federal issue is presented by a habeas claim challenging the weight of the evidence adduced at trial.  *See Graham*, 2004 WL 768579, at *14 (citations omitted); *Feliz v. Conway*, 378 F.Supp.2d 425, 430 n.3 (S.D.N.Y. 2005) (citations omitted); *Bradley v. Johnson*, No. 99-CV-086, 2005 WL 1577171, at *4 (W.D.N.Y. July 1, 2005) (citations omitted); *Glisson v. Mantello*, 287 F.Supp.2d 414, 441 (S.D.N.Y. 2003) (citing *Givens v. Burge*, No. 02 Civ. 0842, 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003) (collecting cases)); *Camacho v. McKinney*, No. 04 Civ.2226, 2004 WL 1490308, at *1 (S.D.N.Y. July 1, 2004) ("petitioner's first ground ...

14

arguing only that the verdict was against the weight of the evidence ... raises no claim cognizable in a federal habeas corpus proceeding"); *Brown v. Fischer*, No. 03 Civ. 9818, 2004 WL 1171277, at *6 (S.D.N.Y. May 27, 2004) (Peck, M.J.) ("[i]t is well-settled that a weight of the evidence claim is not cognizable on federal habeas review") (citations omitted).  Thus, Stein's second ground for relief is denied for this reason.

A challenge to the sufficiency of the evidence, however, is amenable to federal habeas review.  *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)); *Norris v. Fischer,* No. 06 CV 2190, 2007 WL 1452127, at *7 (E.D.N.Y. May 15, 2007).  In the challenged criminal matter, the Appellate Division "disagree[d]" with Stein's claim that "the conviction [wa]s not supported by legally sufficient evidence."  *See Stein*, 306 A.D.2d at 943-44.  Therefore, this Court must ascertain whether that determination is either contrary to, or represents an unreasonable application of, relevant, clearly established Supreme Court precedent.

### a.     Clearly Established Supreme Court Precedent

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime(s) with which he is charged.  *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *In re Winship*, 397 U.S. 358, 364 (1970).  This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  A habeas petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only

if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995). The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson*, 443 U.S. at 319. The relevant inquiry in this regard is "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984) (citing *Jackson*) (other citations omitted).

### b.     Contrary To, or Unreasonable Application Of, Relevant Supreme Court Precedent

"When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Ponnapula*, 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)); *see also Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 811 (2d Cir. 2000) (citing *Quartararo*); *Flowers v. Fisher*, No. 03 CV 5405, 2006 WL 3050876, at *8 (E.D.N.Y. Oct. 23, 2006) (citations omitted); *Hill v. Miller*, No. 03-CV-1738, 2005 WL 807044, at *2 (E.D.N.Y. Apr. 8, 2005) (citing *Ponnapula*). Therefore, this Court must consider the elements the prosecutor was required to prove beyond a reasonable doubt to properly convict Stein of Bravos' depraved indifference murder.

To establish a conviction for second degree depraved indifference murder in New York, the prosecution was required to establish that, under circumstances evincing a depraved indifference to human life, Stein recklessly engaged in conduct which created a grave risk of death to Bravos, thereby causing his death. *See Fama*, 235 F.3d at 811-12 (citing N.Y. Penal

16

Law §§ 125.25(2)).

Although, as discussed more fully above, Stein presented evidence at trial that suggested that Bravos' injuries may have been the result of a fall, *e.g.*, Trial Tr. at pp. 1227, 1399-1407, his trial testimony in which he attempted to explain how the police happened to find him wearing boots that contained the victim's blood – thereby placing Stein at the scene of the crime – strains credulity. *See* Trial Tr. at pp. 1475-76.[9] Moreover, the prosecution presented compelling evidence that strongly suggested that Bravos' injuries were consistent with him having been the victim of an assault. Specifically, the blood spatter evidence at the crime scene was consistent with the victim having been kicked, punched and/or hit with an object. Trial Tr. at pp. 524, 539. Moreover, the evidence demonstrated that his injuries were caused by numerous blows, including "multiple blows" that occurred while the victim lay on the ground. *See* Trial Tr. at p. 1078. The evidence further established that Bravos was last observed by two individuals in the company of Stein the afternoon Bravos was assaulted (Trial Tr. at pp. 605-11, 620-27), and DNA testing that was performed on blood found on the boots Stein was wearing

---

[9]     According to Stein, a series of unfortunate events resulted in the police apprehending Stein while wearing the incriminating boots. Specifically, Stein testified that on August 29, 2000, he was riding his bicycle when he spied a pair of boots in a nearby pile of garbage. Trial Tr. at pp. 1475-76. Stein removed the boots – which coincidentally contained the victim's blood (Trial Tr. at p. 956) – from the trash, placed them over his shoulder and attempted to ride away. Trial Tr. at p. 1476. The weight and placement of the boots on Stein's shoulder somehow caused him to lose his balance on his bicycle. Trial Tr. at p. 1476. Stein claims that he then removed tennis shoes he was wearing and began placing the blood-stained boots – which matched the description of the boots Andrews testified that Stein was wearing when he left her home the morning Bravos was killed (*see* Trial Tr. at pp. 700-01, 761-62) – on his feet. Trial Tr. at p. 1476. At that exact moment, a police car arrived at the precise intersection at which Stein was located and began questioning him, which eventually resulted in the police noticing the blood-stained boots on Stein's feet. Trial Tr. at pp. 701-03, 1476, 1494.

when questioned by law enforcement agents revealed the presence of Bravos' blood (Trial Tr. at p. 956). Medical evidence further established that: i) there was blood present on both sides of Bravos' brain; ii) he had suffered a "severe brain injury;" and iii) the injuries sustained by Bravos were consistent with blunt force trauma to his head. Trial Tr. at pp. 852-56, 860. The foregoing evidence, particularly when viewed in combination with Stein's candid admission to Coleman that Stein had recently assaulted an "old man"[10] in a way that caused Stein to have "blood all over him," Trial Tr. at pp. 785-86, is plainly sufficient to surpass the relatively modest hurdle posed by *Jackson*. Therefore, the Appellate Division's decision denying this aspect of petitioner's appeal, *see Stein*, 306 A.D.2d at 943-44, is neither contrary to, nor represents an unreasonable application of, the above-cited Supreme Court precedent. Therefore, Stein's third ground for relief is denied.

### 3.     Failure to Suppress Physical Evidence

In his fourth and final claim, Stein claims that the County Court improperly denied Stein's suppression motion regarding the admission of Stein's boots, and the related blood evidence, into evidence at trial. *See* Am. Pet., Ground Four.

This claim is rooted in Stein's rights under the Fourth Amendment to the United States Constitution, which "protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....'" *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004) (quoting U.S. Const., amend. IV); *see White v. Herbert*, No. 02-CV-0439, 2006 WL 3728878, at *10 (N.D.N.Y. Dec. 15, 2006) (McCurn, S.J.).

---

[10]     At the time of the crime, Bravos was eighty-four years old. *Stein* 306 A.D.2d at 943.

18

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that such claims are generally unavailable for federal habeas review. *See White*, 2006 WL 3728878, at *10; *Blanchard v. White*, No. 02-CV-0081, slip op. at 27-29 (N.D.N.Y. Apr. 25, 2005) (Treece, M.J.), *adopted*, *Blanchard v. White*, No. 02-CV-0081 (Dkt. No. 20) (N.D.N.Y. Apr. 25, 2005) (Kahn, J.). Specifically, in *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494 (footnote omitted); *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Stone*); *White*, 2006 WL 3728878, at *10 (citations omitted).

The Second Circuit has determined that federal habeas review of Fourth Amendment claims may only be undertaken in this Circuit where one of the following two conditions exist: a) if the state has provided no corrective procedures at all to redress alleged Fourth Amendment violations; or b) if the state has provided a corrective mechanism, but the petitioner was precluded from using that mechanism because of an "unconscionable breakdown" in the underlying process. *Capellan*, 975 F.2d at 70 (citation omitted); *White*, 2006 WL 3728878, at *10 (citations omitted).

In New York, criminal defendants may assert Fourth Amendment challenges by filing a motion that seeks to suppress evidence pursuant to CPL § 710. *See id.*; *Capellan*, 975 F.2d at 70 n.1; *White*, 2006 WL 3728878, at *10.[11]

---

[11]     "The 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim. Proc. Law § 710. 10 et seq. (McKinney 1984 & Supp.1988), as being facially adequate.'" *Capellan*, 975 F.2d at 70 n. 1 (quoting

In the underlying criminal matter, Stein availed himself of his right to challenge the admission into evidence of the incriminating evidence obtained by law enforcement agents; defense counsel filed a pretrial omnibus motion in the County Court in which he sought, *inter alia*, the suppression of the physical evidence the police had obtained during the course of their criminal investigation.  Following a hearing on that application, Judge Aloi issued a Decision and Order that granted in part and denied in part Stein's application.  *See* Appendix in Support of Appeal ("App."). at pp. A229-43.[12]  In addressing Stein's appellate challenge to the County Court's ruling on the suppression motion, the Appellate Division opined that Judge Aloi:

> properly denied the motion of defendant to suppress the boots he was wearing when he was detained and interviewed by the police. Police officers may properly seize an item in plain view without a warrant if:  "(1) the police are lawfully in the position from which the object is viewed; (2) the police have lawful access to the object; and (3) the object's incriminating nature is immediately apparent" (*People v Diaz*, 81 NY2d 106, 110 [1993]).  Here, the dark boots worn by defendant were in plain view when the police detained him on a street corner and brought him to the police station for questioning.  The boots fit the general description given by a witness of the dark boots defendant had been wearing before and after the crime, and they had what appeared to be blood spatters on them, similar to blood spatters observed at the crime scene.  Under the circumstances, the officers had the

---

*Holmes v. Scully*, 706 F.Supp. 195, 201 (E.D.N.Y. 1989) and citing *Gates v. Henderson* 568 F.2d 830, 837 & n.4 (2d Cir. 1977)) (en banc) (other citation omitted).

[12]     Judge Aloi denied Stein's suppression motion to the extent that he sought to preclude the prosecutor from introducing into evidence either the boots seized from Stein after the assault or the blood evidence found on those boots.  *See* App. at pp. A229-35. However, in granting Stein's suppression motion in part, the County Court precluded the District Attorney from utilizing at trial evidence the police had seized from the home of an acquaintance of Stein, who had allowed him to keep several bags of clothes in her residence for a fee.  *See* App. at pp. A235-43.  Forensic testing on a baseball cap that was found inside one of his bags of clothes revealed the presence of the victim's blood.  *See* App. at pp. A138-39; *see also id.* at p. A259.

> authority, under the plain view doctrine, to seize defendant's
> boots.

*Stein*, 306 A.D.2d at 943.

This Court's review of the state court record relating to Stein's suppression motion reveals no evidence to support a conclusion that the trial court failed to conduct a reasoned method of inquiry into the relevant questions of fact and law concerning that application.  To the contrary, the County Court thoroughly addressed all of the claims raised by Stein in a comprehensive decision consisting of over thirty pages, some of which, as noted *ante* at n.12, was favorable to Stein's defense.  *See* A214-43.  Moreover, this Court endorses the findings of both the County Court and the Appellate Division which held that Stein's boots were in the plain view of the police at the time he was being questioned by law enforcement agents, thereby authorizing the police to seize those boots even without any warrant or petitioner's consent.[13] *E.g.*, *McCardle v. Haddad*, 131 F.3d 43, 48 (2d Cir. 1997) ("evidence lying in plain view" constitutes an exception to rule prohibiting the introduction of evidence obtained from a warrantless search) (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)); *see also Wilson v. Sup't, Attica C.F.*, No. 00-CV-0767 (Dkt. No. 27), slip op. at 24 (N.D.N.Y. Nov. 24, 2003) (Sharpe, M.J.) (photographs taken of items outside petitioner's apartment were in plain view of the officer and therefore admissible even in the absence of a warrant) (citing *McCardle*, *Hicks*), *adopted Wilson v. Sup't, Attica C.F.*, No. 00-CV-0767 (Dkt. No. 28) (N.D.N.Y. Feb. 4, 2004) (Mordue, J.), *appeal dismissed sub nom.*, *Wilson v. People of the State of N.Y.*, No. 04-4339pr (2d Cir. Sept. 13, 2004).

---

[13]     Detective Carr testified that Stein voluntarily provided the police with his boots.  Trial Tr. at pp. 702-03.

In light of the foregoing, this Court denies the fourth and final ground asserted by Stein in his amended petition.  *See Capellan*, 975 F.2d at 70 (citation omitted); *Van Stuyvesant*, 2007 WL 2584775, at \*24-25; *Jones v. Poole*, No. 06 CIV. 7172, 2007 WL 2456646, at \*5 (S.D.N.Y. Aug. 21, 2007); *White*, 2006 WL 3728878, at \*10.

## III.   Certificate of Appealability

Finally, the undersigned notes that 28 U.S.C. § 2253(c)(1) provides in relevant part that:

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court ....[14]

A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2).  Since petitioner has failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

**WHEREFORE**, after having reviewed the state court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

**ORDERED**, that Stein's amended petition (Dkt. No. 4) is **DENIED** and **DISMISSED**, and it is further

**ORDERED**, that the Clerk of Court serve a copy of this Memorandum-Decision and

---

[14]     Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  *See* Fed.R.App.P. 22(b).

Order upon the parties to this action by electronic mail, and it is further

**ORDERED**, that any state court records that were not filed in this action be returned

directly to the Attorney General at the conclusion of these proceedings (including any appeal of

this Memorandum-Decision and Order filed by any party).

**IT IS SO ORDERED.**

Dated: September 19, 2007
      Syracuse, New York

George H. Lowe
United States Magistrate Judge